## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **RAY PRITCHARD and SHARON MELICK, on behalf of themselves and all similarly situated individuals,** | **Case No.: 19-2777** |
| Plaintiffs, | **Judge Algernon L. Marbley** |
| **v.** | **CLASS ACTION COMPLAINT** |
| **CENTRUS ENERGY CORP.,** | JURY DEMAND ENDORSED HEREON |
| **UNITED STATES ENRICHMENT CORPORATION,** | |
| **URANIUM DISPOSITION SERVICES, LLC,** | |
| **BECHTEL JACOBS COMPANY, LLC,** | |
| **LATA/PARALLAX PORTSMOUTH, LLC, and** | |
| **MID-AMERICA CONVERSION SERVICES,** | |
| Defendants. | |

Plaintiffs Ray Pritchard and Sharon Melick, on behalf of themselves individually and all others similarly situated (collectively "Plaintiffs"), based upon their personal knowledge, information and belief, and the investigation of their counsel allege as follows:

## I.      PRELUDE

1.      This Complaint concerns the failure of legislators, regulators, protection agencies, businesses, and numerous others to prevent, mitigate and/or stop the contamination of miles of land, schools, water, air, buildings and people in Pike County, Ohio. Through the negligent and

reckless operation of the 3,777 acre site known as the Portsmouth Gaseous Diffusion Plant, or "A-Plant" as it is known locally (referred to herein as the "A-Plant"), the Defendants have contaminated Pike County, Ohio with toxic contaminants and taxpayers are paying for the cleanup. The contaminates that the Defendants discharged upon Pike County include dangerous, radioactive materials and metals that are some of the most harmful contaminants known to mankind.

2. By this Complaint, the residents and property owners who have been harmed by the Defendants' actions and inactions ask this Court to help those who have been sacrificial lambs for too long. The Plaintiffs and others who live and own property in the vicinity of the A-Plant have sacrificed their health, their children's health and their property so that we could all enjoy the benefits of the enriched uranium processed at the A-Plant. Now they ask this Court to address the harm caused by the Defendants actions and to protect them from future harm.

3. Unbeknownst to the residents of Pike County, Ohio, the A-Plant has been discharging highly dangerous radioactive materials and metals upon Pike County for over 40 years. The A-Plant was opened in approximately 1954, as a uranium enrichment operation that provided enriched uranium for nuclear bombs. In the Cold War years, the intense focus on building bombs superseded concerns of safe handling of waste and contamination of the nearby properties. As Brian Blair, an Ohio EPA supervisor who participated in the state's first inspection of the site in 1986, told the Dayton Daily News about the years prior to 1986, "[t]hey were not managed even according to the best technology available at that time."

4. As the Cold War tensions eased, the enriched uranium from the A-Plant was used for nuclear energy. Although the use of the enriched uranium provided by the A-Plant changed, the lack of concern for safety and contamination remained pervasive at the A-Plant. A-Plant operators continued to ignore the safety of workers and the residents of Pike County, in favor of

providing enriched uranium for nuclear reactors.

5.       Until approximately 2001, government contractors enriched uranium at the A-Plant. The Goodyear Atomic Corp. operated the A-Plant for its first 32 years. In 1986, a subsidiary of Martin Marietta took over the A-Plant management. Martin Marietta's subsidiary managed the A-Plant until 1995 when Lockheed Martin took over operation of the A-Plant. Lockheed Martin operated the A-Plant until 1998 when the United States government privatized operation of the A-Plant.

6.       In 1998, operation of the A plant was turned over to the private entity, Defendant United States Energy Corporation. Despite the privatization of the A-Plant, residents of Pike County remained in the dark about the safety and operation of the A-Plant. The operation of uranium enrichment plants is considered highly confidential due and hidden by the veil of national security concerns.

7.       Until the late 1980s the Department of Energy (DOE) was not subject to environmental regulation. Environmental regulators such as the Ohio Environmental Protection Agency ("Ohio EPA"), had no jurisdiction over the A-Plant. Even today, national security concerns limit the scope of regulation by environmental regulators.

8.       In 1986, the Ohio EPA was allowed limited access the A-Plant. The Ohio EPA found that A-Plant operators had tilled highly radioactive oils into the soil around the A-Plant, dumped radioactive materials and a toxic chemical cocktail into ditches that ran to the Little Beaver Creek, and even dumped carcinogenic solvents out the back door. The Ohio EPA found a large pit full of toxic chemicals. As a result of the Ohio EPA's limited access, in 1989, Ohio filed suit against the DOE.

9.       In response to reports by the Ohio EPA and others, of inadequate safety at the A-

3

Plant, in 2001, the DOE began investigating the A-Plant's poor environmental practices. The DOE found inadequate safety, mishandling of radioactive materials, worker exposure to radioactive materials, failure to monitor emissions, poor record keeping and other issues at the A-Plant. The DOE found that at least 400 accidental releases of uranium gas or toxic fluorine had occurred at the A-Plant. The true number of releases could not be determined due to shoddy record keeping by A-Plant operators. DOE investigators also found that in both 1982 and 1993 a significant amount of technetium had been released into the air. Technetium is a known carcinogen. Finally, the DOE found that uranium contaminated solvents were burned in an incinerator until 1986 when the Ohio EPA had shut down the incinerator. As a result of the burning of uranium contaminated solvents in the incinerator, the soil around the incinerator site is radioactive.

10.     Until 1988, the DOE permitted the pumping of waste into the A-Plant's unlined pond. Numerous incredibly dangerous materials were pumped into the unlined pond, including radioactive uranium, technetium, plutonium, trichloroethylene and other toxins. These materials leached into the groundwater and the Little Beaver Creek. The contaminated plume of groundwater leached into the Little Beaver Creek which leads to the Scioto River.  Residents and property owners had no idea these materials were getting into the water in which their children swam.

11.     Since 2001, the A-Plant has been in a shutdown process. The process of shutting down a uranium enrichment plant is as dangerous, if not more dangerous than operating the plant. Extreme caution must be taken to ensure contaminated equipment, and areas of the A-Plant are shutdown in a manner that does not release contamination. Uranium on the equipment must be safely cleaned and removed or it could cause a small nuclear reaction that could injure or kill plant workers and residents.

12.     Approximately 20,000 cylinders of stored corrosive radioactive waste at the A-

4

Plant must be safely stored until they can be converted to a more stable form of uranium and transported to a waste storage facility. The radioactive waste cylinders weigh as much as 14 tons, and many are rusted on the exterior. A new plant currently being constructed on the site of the A-Plant will convert the cylinders of uranium waste to a more stable form.

13.     Critical mistakes have been made during the cleanup and shutdown of the A-Plant. Contaminated ground water has been permitted to spread. Airborne contamination has been leaked and found at Zahn's Middle School and other areas in the vicinity of the A-Plant. Workers have contracted cancer and a study by the Northern Arizona University found numerous spots of contamination throughout Pike County. The NAU Study found uranium and plutonium in homes, schools and creeks around the A-Plant. The DOE later admitted that it had also found trace amounts of a second isotope, americium, in 2018 but had failed to disclose the finding at the time.

14.     As if the cleanup was not causing enough problems, recently residents were alarmed to learn that a new type of enrichment plant is being constructed at the A-Plant. The United States Enrichment Corporation wants to replace the gaseous diffusion plant at the A-Plant with a newer uranium enrichment facility.

15.     Residents, such as the Plaintiffs, have reason to be concerned about the shutdown, cleanup and new enrichment facility. The Plaintiffs and other residents who live in the vicinity of the A-Plant trusted the Defendants to take extraordinary precautions in order to protect the residents from exposure to the harmful fallout of the activities conducted at the A-Plant. Residents and landowners were repeatedly assured that the water, air and soil were safe as all precautions were being taken to make sure the dangerous materials at the A-Plant would not reach the outside. These assurances were false. Even today, contamination is being spread from the A-Plant through poor containment and shoddy shutdown procedures.

16. Defendants have repeatedly failed to take the necessary precautions in storing and shutting down the A-Plant. Rather than take the necessary precautions, Defendants chose to misreport the amount of contamination that was being spewed upon the land residents in the vicinity of the A-Plant. As a result, the land, schools, homes, buildings, creeks, water sources and people in the vicinity of the A-Plant have been subjected to extremely harmful contamination by some of the most dangerous substances known to mankind.

17. Contaminants that could only have originated from the A-Plant have been found approximately two miles from the A-Plant. The first incident known to the public occurred on May 13, 2019, when neptunium radioactive isotopes were detected by an air monitor near Zahn's Corner Middle School. Zahn's Corner Middle School is located in Piketon, Ohio, approximately two miles from the A-Plant. The School was suddenly closed due to health concerns the same day that the air monitor detected neptunium. A subsequent study found enriched uranium inside the school in addition to the neptunium that was detected by an air monitor next to the school. The School is regularly attended by more than 300 students.

18. Plaintiffs' residence is not far from Zahn's Corner Middle School. Plaintiffs' residence is approximately one mile from the A-Plant. The radioactive materials and other harmful contaminants being dispersed from the A-Plant have made the Plaintiffs' residence unsafe, unsaleable, and/or only saleable at a greatly reduced price. Plaintiffs' land and homes are worth substantially less value than they would be worth if not for the contamination caused by the Defendants' activities at the A-Plant. Additionally, the Defendants' failure to properly control the contamination from the A-Plant have created serious health risks for the Plaintiffs.

19. Plaintiffs seek remediation of the radioactive materials and other harmful contaminants found on their property and the properties of similarly situated residents and

injunctive relief to protect the Plaintiffs and Members of the Class defined *infra* (Class Members) from further harm. Plaintiffs and Class Members have suffered monetary damages, property loss, and/or other losses as a result of the Defendants' contamination of the land, schools, homes, buildings, creeks, water sources and people in the vicinity of the A-Plant. Plaintiffs' losses will grow exponentially if the Defendants are not enjoined from continuing to contaminate land, schools, homes, buildings, creeks, water sources and people in the vicinity of the A-Plant.

## II.  PARTIES

20.    Plaintiffs Ray Pritchard and Sharon Melick reside in Beaver, Ohio. The Plaintiffs' residence is located in Pike County, Ohio. Their residence is approximately a one-mile, or less straight-line distance from the A-Plant. Plaintiffs' home is close to Zahn's Corner Middle School, where neptunium radioactive isotopes and uranium were found. The A-Plant is visible from the Plaintiffs' residence and the wind blows from the A-Plant toward the Plaintiffs' residence. The Google Maps satellite view below shows how close the Plaintiffs' residence is to the A-Plant. The Plaintiffs' water source is also located very near the A-Plant and has likely been contaminated. Plaintiffs have been damaged by the contamination discharged from the A-Plant. Plaintiffs seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, inconvenience, punitive and property damage, remediation, and injunctive and declaratory relief as necessary to protect human health and the environment.



21.     Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc"), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

22.     Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland. USEC is a wholly owned subsidiary of Centrus Energy Corp.

23.     Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principle place of business in Florida.

24.     Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principle place of business in Kentucky.

25.     Defendant Mid-America Conversion Services, LLC ("MCS") is a Delaware limited liability company with its principle place of business in Kentucky.

26.     Defendant Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware

limited liability company with its principle place of business in Tennessee.

27.     Defendant Lata/Parallax Portsmouth, LLC ("Lata/Parallax") is a New Mexico limited liability company with its principle place of business in New Mexico.

## III.  JURISDICTION

28.     Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1332(d)(2). This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Diversity exists between named Plaintiffs, who are residents of Ohio, and Defendants who have their principal places of business in other states and are therefore residents of other states. The proposed class exceeds 100 persons, and, the amount in controversy exceeds $5,000,000.00.

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in the territorial jurisdiction of this Court.

## IV.  FACTUAL ALLEGATIONS

30.     The history of the A-Plant contamination of the properties and persons in the vicinity of the A-Plant is alleged in the Prelude, *supra.* That history shows the long suffering of the residents who live, work and go to school in the vicinity of the A-Plant as a result of the continuing contamination emanating from the A-Plant. The recent releases of contamination from the A-Plant and the Defendants' actions and inactions in failing to prevent, report and/or mitigate the harm from the contamination demonstrate that the suffering of persons who reside in the vicinity of the A-Plant continues.

31.     In July 1993, Defendant USEC assumed the uranium enrichment operations at the A-Plant and operated the A-Plant until 2001. The primary mode of enrichment was the gaseous diffusion of uranium hexafluoride to separate the lighter fissile isotope, U-235, from the heavier

non-fissile isotope, U-238. Around 2001, the A-Plant ceased operation as a uranium enrichment plant.

32.     The discontinuance of uranium enrichment activities at the A-Plant did not bring an end to the dangers associated with the gaseous diffusion plant. The shutdown of a gaseous diffusion plant is as dangerous, if not more dangerous than the operation of such a plant. Equipment, facilities, materials and other items at the gaseous diffusion plant must be safely stored, cleaned, maintained and decontaminated in a manner that prevents exposure to the contaminants for employees and residents who live in the vicinity of the plant. Additionally, depleted uranium hexafluoride that has been produced as a result of the uranium enrichment must be safely stored, while awaiting preparation for transport to a waste storage facility. The depleted uranium hexafluoride must also be converted to a more stable form before it can be transported to a waste storage facility.

33.     In addition to the storage and decontamination of the facilities at the A-Plant, a massive environmental cleanup has been underway at the A-Plant for more than 20 years. Like the storage and decontamination, the environmental cleanup of radioactive materials and other toxic materials involves substantial risks to workers and residents who live in the vicinity of the A-Plant.

34.     From 1997 to 2005 Defendant Bechtel Jacobs was responsible for environmental remediation at the A-Plant. Environmental cleanup at the A-Plant has been the subject of reports of wasteful practices, flawed procedures, inadequate safeguards, and numerous reports of dangerous actions during the incredibly expensive cleanup operations at the A-Plant.

35.     From 2001 to 2011, Defendant USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration, including the control of radioactive materials and other dangerous contamination. Initially, the process equipment was kept in cold standby. During this

time, the process equipment was capable of being restarted if the United States required more enriched uranium. After a period of cold standby, the facilities at the A-Plant were transitioned to cold shutdown. In the cold shutdown, the equipment and systems at the A-Plant facility were permanently disengaged, and the equipment was prepared for decommissioning. The cold standby and the cold shutdown must be performed with extreme care. The inside of the facilities at the A-Plant are contaminated with radioactive materials, beryllium polychlorinated biphenyls, asbestos and other harmful contaminates. Thus, the maintenance and decommissioning of the buildings at the A-Plant requires extreme caution to avoid the release of contaminants.

36.     In 2002, Defendant USEC signed a lease for use of centrifuge-related equipment and facilities at the A-Plant. Defendant UDS was contracted to design, build, and operate a depleted uranium hexafluoride conversion plant. Depleted uranium hexafluoride is produced as a result of the uranium enrichment process that occurred at the A-Plant. The depleted uranium hexafluoride conversion plant will be used to convert depleted uranium hexafluoride to the more stable form, uranium oxide, that can be transported and stored at a waste storage facility. The conversion process itself produces dangerous byproducts such as hydrofluoric acid. Conversion of the entire inventory of depleted uranium hexafluoride at the A-Plant will take in excess of 10 years.

37.     In 2004, Defendant USEC began operating the American Centrifuge Lead Cascade Facility (ACLCF) at the A-Plant. The ACLCF is a test loop used to demonstrate the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. The ACLCF is a test loop for Defendant Centrus' American Centrifuge Plant ("ACP"). Construction of the ACP began in 2007 and was halted in 2009. In January 2019, construction of the ACP at the A-Plant resumed. Centrus' centrifuge operations are carried out pursuant to source materials licenses that permit possession of radioactive material. The source materials licenses only permit possession of

11

radioactive material. The licenses do not permit Centrus to disperse radioactive materials via air or water to nearby properties.

38.     From 2005 to 2010 Defendant LATA/Parallax was responsible for environmental remediation at the A-Plant. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning facilities, highly enriched uranium disposition, operating the site waste storage facilities, and surveillance and maintenance activities, as well as other activities. Like other cleanup Defendants, LATA-Parallax was the subject of complaints that they failed to follow proper procedures, wasted money and resources and failed to follow proper safety protocols during the environmental remediation at the A-Plant.

39.     Groundwater cleanup at the A-Plant has proven to be a very expensive and difficult part of the environmental remediation. Five plumes of contaminated groundwater lie beneath the A-Plant. At least one of the plumes is very close to a private farm and contamination was found in a monitoring well on the farm. The Ohio EPA has made numerous complaints about the environmental remediation at the A-Plant. For example, one complaint by the Ohio EPA concerned polluted groundwater that was allowed to spread because of the poor construction of a barrier wall. The cleanup has been so difficult that proposals have been made to lessen the standards for the cleanup. One proposal requested that they leave contaminated water underneath the A-Plant simply because nobody drinks it.

40.     In 2010, Defendant BWXT was contracted to operate the depleted uranium hexafluoride conversion plant located at the A-Plant. In addition to operating the depleted uranium hexafluoride conversion plant, BWXT was also responsible for continuing cylinder surveillance and maintenance services for the inventory of uranium hexafluoride cylinders.

41.     In 2015, a plan was agreed to for disposing more than 2 million cubic yards of waste

that would be generated from the A-Plant decontamination and decommissioning process. The disposal plan includes construction of an on-site waste disposal facility. Construction activities on the waste disposal facility, including site clearing and roadway construction, began around 2017.

42.     In 2016, Defendant USEC's successor, Defendant Centrus, ceased uranium enrichment operations at the ACLCF located at the A-Plant. The process of shutting down the ACLCF also presents risks of releasing contamination. Uranium gas must be removed from the centrifuges, extensive process piping and other parts of the ACLCF. The centrifuge equipment must be dismantled and cleaned in a safe and secure manner. Like the decommissioning of the original gaseous diffusion plant, the decommissioning of the ACLCF must be handled with utmost care to avoid the release of radioactive materials and other dangerous contamination. The ACLCF is currently in decommissioning phase.

43.     In 2016, Defendant MCS was contracted to operate the depleted uranium hexafluoride conversion plant. MCS is responsible for cylinder surveillance and maintenance at the depleted uranium hexafluoride conversion plant. Surveillance and maintenance of depleted uranium hexafluoride cylinders is a serious task that entails operations critical to the prevention of the release of contamination.

44.     Until May 2019, residents who live near the A-Plant were led to believe that operation of the A-Plant was proceeding safely, and the residents were free from danger. On May 13, 2019 Zahn's Corner Middle School in Piketon was suddenly closed due to health concerns because radioactive neptunium isotopes were detected by an air monitor next to the School. A subsequent study found uranium inside the School. The School is approximately two miles from the A-Plant. Zahn's Corner Middle School is regularly attended by more than 300 students every school year. The neptunium isotope and uranium at Zahn's Corner Middle School prompted residents to

become concerned that the A-Plant was not being operated as safely as they were lead to believe. Residents, such as the Plaintiffs, whose property was even closer to the A-Plant became increasingly concerned as more and more contamination from the A-Plant was found in the area.

45.    Plaintiffs' properties and residence are within the zone impacted by the release of radioactive materials, including alpha emitting radionuclides. Samples taken around Plaintiffs' residence and/or at other nearby locations in the vicinity of the A-Plant confirm an elevated presence of radioactive particles. Environmental evidence gathered thus far indicates that property and persons near the A-Plant have been and continue to be exposed to toxic and radioactive substances and are negatively impacted by toxic and radioactive releases from the A-Plant.

46.    Environmental sampling and scientific testing of properties near the A-Plant reveal the presence of radioactive and toxic materials consistent with those expected to be found inside the A-Plant facilities where uranium enrichment and conversion operations are conducted. Tests reveal the presence of these radioactive and toxic materials in and around buildings and properties near the A-Plant. The A-Plant is undoubtedly the source of the recent contamination in the vicinity of the A-Plant. The radioactive and toxic materials are of the kind that could only originate at the A-Plant. The radioactive and toxic materials found in the vicinity of the A-Plant are not naturally occurring in the area and could not have originated from any other location in the area. Scientific analysis of samples of the radioactive and toxic materials found in the vicinity of the A-Plant has revealed the presence of "fingerprints" linking the samples to hazardous, toxic, carcinogenic, radioactive materials either stored, processed and/or manufactured at the A-Plant.

47.    Plaintiffs' residence is approximately one mile in a straight-line distance from the A-Plant. Furthermore, the typical wind pattern puts the Plaintiffs' residence directly in the path of radioactive air emissions, radioactive particles distributed by the wind and other toxic materials

originating from the A-Plant. Plaintiffs' residence is clearly in the zone of contamination.

48.     A recent study conducted by Northern Arizona University ("NAU Study") found enriched uranium in surface waters, sediments, and interior dusts in the Piketon area. The NAU Study indicated that the enriched uranium in the area could only have originated at the A-Plant. The NAU Study also found that non-fallout neptunium and plutonium in bed sediments, suspended sediments, and interior dusts in the Piketon area. Non-fallout neptunium was found in sediments of an unnamed creek that is draining an active landfill construction area. Enriched Uranium was found in interior spaces of Zahn's Corner Middle School, and in attic dust in the Piketon area. The NAU Study further found that emissions from the A-Plant are the only possible source of the enriched uranium, neptunium and plutonium encountered in environmental samples from the Piketon area.

49.     Radioactive isotopes are considered among the most toxic materials known to humans. Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other materials which may then also decay by releasing radiation energy and transforming into other materials.

50.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization which can damage chemical structures. When ionizing radiation passes through human cells, it can cause damage within those cells resulting in mutations in genetic material, which can lead to cancer and other harms.

51.     Exposure to radiation occurs in the person externally and internally. Radioactive

materials in the environment can result in exposure to radiation through the skin (the largest organ in the body). Internal exposure to radiation can occur through inhalation of radioactive materials, ingestion of materials that contain radioactive contamination, and by absorption through other openings in the body. Even small, brief exposures to radioactive materials can be extremely harmful to persons and the environment for a long duration. The ease of which persons are exposed to harmful radiation and the serious consequences of exposure are the primary reasons that it is critical to prevent radiation leaks and to act quickly to mitigate damage once radioactive materials are released into the environment.

52.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. These include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear. Research shows that uranium has a high chemical affinity for DNA and causes genetic damage to individuals resulting in birth defect outcomes and cancer at levels much greater than previously modelled. The lasting effects of exposure to uranium are so great that much is still unknown about the long-term effects of exposure.

53.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. With genetic injury to reproductive cells, the probability of detrimental effects to the descendants of the exposed persons greatly increase. These genetic mutations can be  passed down to a person's offspring even generations later, manifesting in injuries such as birth abnormalities and cancer.

54.     The harmful effects of the radioactive materials and other contaminants at the A-

Plant have been demonstrated in real persons and acknowledged by the United States government. Gary Sexton, a former chemical operator at the A-Plant now has trouble breathing due to the beryllium levels at the A-Plant. Sexton and 37 other workers at the A-Plant are suspected of having contracted chronic beryllium disease that is potentially fatal. Sexton told reporters that most of the A-Plant workers suspected of having contracted chronic beryllium disease are deceased.

55.     Donald Cruse, a former employee at the A-Plant, dismantled radiation contaminated equipment at the A-Plant. Cruse told reporters that he was often sent to dismantle the contaminated equipment without protective gear. Cruse has suffered from melanoma and lost part of his larynx to cancer. Cruse stated to reporters that managers at the A-Plant told him and other workers that "none of that would hurt us" and "there wasn't enough there to bother us."

56.     Kenny Estep worked as a truck driver at the A-Plant. Estep hauled radioactive waste to a plant landfill. In 1978 he was told to dump snow on a leaking cylinder of radioactive uranium hexafluoride. Estep died of a rare form of liver cancer seven years later. Estep's widow was compensated for her loss after the United States government admitted in 1999 that it had harmed workers at the A-Plant and other atomic plants.

57.     Residents who live in the vicinity of the A-Plant have also experienced more than their share of cancer and other diseases, and animals and plants nearby were found to contain harmful contaminants. A local residents group identified 247 cancer cases within a six-mile radius of the A-Plant. Tests on deer killed by cars showed uranium isotopes in the livers of the deer. Traces of uranium were found in milk and egg samples from area farms and from vegetables in the gardens of residents in the vicinity of the A-Plant. And, fish from area waterways were found to contain uranium and plutonium.

58.     One of the most dangerous aspects of radioactive materials is the length of time that

radioactive isotopes will persist and accumulate in the environment. Radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The "half-life" of a radioactive isotope is the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eighth the original sample, and so forth.

59.     The extremely long half-life of enriched uranium makes it particularly important to properly contain, store and cleanup enriched uranium. Other radioactive materials such as the plutonium and neptunium found in the NAU Study, have similarly long half-lives.

60.     Although there is still much to learn about the long-term effects of exposure to radioactive materials, much of the toxic and carcinogenic effects of exposure to radioactive materials have been a matter of general scientific knowledge since the early 20th Century. The general scientific knowledge of the dangers of radioactive materials makes it clear that it is vital to prevent the release of radioactive materials and that when such materials are released, it must promptly be reported and mitigated.

61.     Defendants, through their silence as well as their aggressive public relation efforts, have falsely reassured the public and Plaintiffs that their operations have not contaminated nearby properties. Defendants made misrepresentations that were meant to assure Plaintiffs that the A-Plant presents absolutely no danger to public health and underreported the seriousness of contamination leaked into the vicinity of the A-Plant.

62.     Defendants fraudulently concealed the omissions of harmful contaminants from the A-Plant. Defendants falsely represented that all safety precautions were taken, residents were in

absolutely no danger, and any emissions would be promptly and accurately reported to the residents. Contrary to the Defendants' fraudulent concealment, Defendants did not follow proper safety precautions, residents were in grave danger and emissions were purposely not reported and/or underreported. As a result of the Defendants' fraudulent concealment of the facts known only to the Defendants, any statutes of limitations applicable to the claims of Plaintiffs and Class Members are tolled. Plaintiffs and other Class Members did not know and could not have known of the dangers caused by the emissions from the A-Plant.

## V.      PRICE-ANDERSON ACT NOT APPLICABLE

63.      Plaintiffs' claims do not fall within the scope of the Price-Anderson Act. The Defendants have never received a license to dispose of radioactive materials on Plaintiffs' properties via air dispersion. The method of disposal that has caused harm to Plaintiffs is not and has never been a licensed activity. Furthermore, no indemnification agreement exists between any of the Defendants and the United States government under 42 U.S.C. § 2210 with respect to the complained of activities.

64.      The ongoing and continuous releases that resulted in the contamination and that form the basis of this suit are not "nuclear incidents" as that term is defined in the Price-Anderson Act. Plaintiffs' claims are freestanding state law claims and do not implicate the Price-Anderson Act and its concerns related to liability limitation and indemnification.

65.      Alternatively, even if the Price-Anderson Act is determined to apply, state law provides the substantive rules of decision. Irrespective of the Price-Anderson Act's applicability, personal injury standards do not apply for property damage claims. This is an action for property damage claims and not for personal injury.

## VI.    THE APPROPRIATENESS OF CLASS TREATMENT

66.    Plaintiffs seek to represent the following classes of individuals:

**(1)    All property owners within a 7-mile radius of the A-Plant ("Property Owner Class");**

**(2)    All residents and former residents with more than one year of residence within a 7-mile radius of the A-Plant ("Resident Class");**

**(3)    Who are NOT Defendants, their officers, directors, employees, or Court personnel with duties related to this case.**

67.    This case presents the quintessential class action for which Rule 23 of the Federal Rules of Civil Procedure was intended. Class Members are readily identifiable from public records such as property records and Census information. The class is too numerous for joinder of individual plaintiffs. There are thousands of individuals who have been adversely affected by the conduct of the Defendants complained of herein. The claims of the Plaintiffs are identical to the claims of the Class. The focus of the case is on the actions and inactions of the Defendants. Even the harm done to the Class Members by Defendants' actions and inactions is similar if not identical.

68.    The Claims of the Named Plaintiffs are typical of the claims of Class Members. Plaintiff Ray Pritchard is a landowner whose land is well within the geographical area of contamination. Plaintiff Pritchard is and has been a resident of the area of contamination for more than thirty years. Plaintiff Melick is and has been a resident of the area of contamination for more than twenty years.

69.    There are common issues of law and fact that make this case well-suited for class treatment. Common issues of law and fact include:

(1)    Whether the Defendants had a duty to prevent the release of harmful

radioactive and other toxic materials from the A-Plant;

(2)     Whether Defendants were negligent in the fulfillment of their duties to prevent the release of harmful radioactive and other toxic materials from the A-Plant'

(3)     Whether the Defendants are liable for the damage caused by the release of radioactive and other toxic materials from the A-Plant;

(4)     Whether the Defendants are strictly liable for the release of radioactive and other toxic materials from the A-Plant;

(5)     Whether the radioactive and other toxic materials released from the A-Plant constitutes a nuisance and/or trespass;

(6)     Whether the Defendants can be enjoined to take steps to protect against the future release of radioactive and other toxic materials from the A-Plant;

(7)     Whether the Defendants failed to properly report the release of radioactive and other toxic materials from the A-Plant;

(8)     Whether the Defendants should be enjoined to require the proper reporting of releases of radioactive and other toxic materials from the A-Plant;

(9)     Whether the Defendants should be ordered to engage in remediation of the Class Members' contaminated properties; and

(10)    Whether the Defendants should be required to provide for medical monitoring of Class Members as a result of their failure to prevent or quickly address the release of radioactive and other toxic materials from the A-Plant.

70.     Plaintiffs have suffered economic loss and injury to their real and personal property and/or have been subjected to health risks, that are typical of the experience of Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and Class Members have suffered an array of damages all stemming from the common facts and issues related to Defendants' emissions of harmful radiation and other toxic materials from the A-Plant.

71.     Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class. Plaintiffs' Counsel has been prosecuting class actions for more than 20 years. Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members. Plaintiffs, through their counsel have adequate financial resources to assure that the interests of the Class will be protected. Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

72.     Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is proper in this case. The Defendants have acted and/or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate for the class as a whole. Plaintiffs and the Class seek an injunction requiring, amendments to Defendants' community warning plans; a third-party compliance audit of Defendants' waste management operations and environmental health and safety program; a study of the entire affected area to identify all impacted properties which require cleanup; decontamination of homes and top-soil replacement to remediate continuing threats to human health and the environment; and implementation of a medical monitoring program to protect Plaintiffs and Class Members from on-going threats to their health.

73.     If injunctive relief is not granted, great harm and irreparable injury to Plaintiffs

and Class Members will continue, and Plaintiffs and Class Members have no adequate remedy at law for the injuries likely to occur. Absent action from this Court, operations at the A-Plant will continue to damage Plaintiffs and Class Members and threaten future injury. Defendants' actions and inactions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

74.     Class treatment of this case is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure. Common issues of law and fact predominate over individual issues, and a class action is superior to other available procedures for the fair and efficient adjudication of this controversy. The interests of all Class Members in establishing the liability of Defendants, and relative fault, for the release of radioactive and other toxic materials are cohesive. The certification of a Class seeking damages is an appropriate means by which injured Plaintiffs and Class Members may assert claims to recover economic losses and property damage. Furthermore, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all Class Members and/or can otherwise be managed through available procedures.

75.     Defendants' conduct presents predominant common factual questions. Plaintiffs' claims arise out of Defendants' course of conduct resulting in the release of radioactive and other toxic materials from the A-Plant. Although Defendants' releases affected a sizeable geographic area and many individuals and businesses, they can be traced back to actions taken, or not taken, by Defendants. The claims asserted by the Plaintiffs and Class present common liability proof that is the same for each member of the Class. Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

76.     The need for proof of Plaintiffs' and Class Members' damages will not cause

individual issues to predominate over common questions. The amounts of economic and non-economic losses, consistent with each of the categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation. The affected area is sufficiently compact geographically to calculate damages for the Class with relative ease.

77.    A class action is superior to maintenance of these claims on a claim-by-claim basis. All actions arise out of the same circumstances and course of conduct. A class action allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each Class Member.

78.    The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each Class Member, and meets all due process requirements.

79.     Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate amount of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Rule 23(c)(4) of the Federal Rules of Civil Procedure.

80.     The particular common issues of liability, comparative fault, and the measure of punitive damages or ratio of punitive damages to actual harm are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## VII.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/GROSS NEGLIGENCE

81.     Plaintiffs re-allege each and every allegation set forth the preceding paragraphs as if fully restated herein.

82.     Defendants' conduct, acts, and omissions violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

83.     Defendants failed to act as a reasonably prudent plant operator under like circumstances would. Defendants failed to exercise due care and caution to prevent harm to property and humans from their operations. With better precautionary measures, more accurate reporting, compliance with applicable regulations, and the use of reasonable care, Defendants, could have, at a minimum, mitigated the harmful effects of their failure to exercise proper care in preventing the release of radioactive and other toxic materials from the A-Plant. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings

when it became clear that harmful radioactive and other toxic materials had been released into the vicinity of the A-Plant. Those omissions render Defendants' operations not reasonably safe.

84.     Defendants failure to warn complained of herein also constitutes negligence. Defendants negligently failed to warn Plaintiffs and Class Members when there were releases of radioactive and other toxic materials. Plaintiffs and Class Members were further damaged by the failure to warn. If Plaintiffs and Class Members had been properly warned of releases they could have taken steps to mitigate the harm caused by the release of radioactive and other toxic materials.

## COUNT II
## TRESPASS

85.     Plaintiffs re-allege each and every allegation set forth the preceding paragraphs as if fully restated herein.

86.     Defendants' conduct as set forth herein constitutes trespass, which resulted in damages to Plaintiffs and the Class.

87.     The release of harmful radioactive and other toxic materials onto the properties of the Plaintiffs and Class Members constitutes a trespass that damaged the Plaintiffs and Class Members. The release of radioactive and other toxic materials onto their properties renders their properties unfit for normal use and enjoyment and substantially reduces the fair market value of their properties.

88.     As described, *infra,* land, homes, schools, creeks, animals and plants in the vicinity of the A-Plant have all been found to contain harmful radioactive materials that originated at the A-Plant. This contamination constitutes a trespass that has directly caused injury to the Plaintiffs and Class Members.

**COUNT III**
**NUISANCE**

89.     Plaintiffs re-allege each and every allegation set forth the preceding paragraphs as if fully restated herein.

90.     Defendants' conduct as set forth herein constitutes a nuisance that continues to this day and has resulted in damage to Plaintiffs and Class Members.

91.     The release of harmful radioactive and other toxic materials in and around the properties of the Plaintiffs and Class Members is a nuisance and renders the properties unfit for normal use and enjoyment and substantially reduces the fair market value of the properties. The nuisance caused by the radioactive and other toxic materials released from the A-Plant has directly caused injury to the Plaintiffs and Class Members.

**COUNT IV**
**ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT LIABILITY**

92.     Plaintiffs re-allege each and every allegation set forth the preceding paragraphs as if fully restated herein.

93.     Defendants' conduct as set forth herein constitutes ultra-hazardous activity, which resulted in damages to Plaintiffs and Class Members. Exposure to the radioactive and toxic mixture in the Pike County environment through human pathways can cause grave bodily injury and has created a need for a mitigation/abatement program to protect the public from further risk of being harmed by Defendants' tortious contamination of their properties. Irrespective of Defendants unconscionable behavior, these claims are subject to absolute/strict liability. The discharges of highly toxic and carcinogenic alpha emitting radionuclides from the A-Plant into the surrounding area have created an imminent and substantial danger to public health.

94.     Plaintiffs and Class Members have been harmed as a result of the Defendants'

conducting ultra-hazardous activity.

**COUNT V**
**INJUNCTIVE AND EQUITABLE RELIEF OF MEDICAL MONITORING**

95.     Plaintiffs re-allege each and every allegation set forth the preceding paragraphs as if fully restated herein.

96.     Plaintiffs and Class Members have been and continue to be exposed to radioactive and other toxic materials that are known to be carcinogenic substances. The Plaintiffs and Class Members, have been exposed to radioactive and other toxic materials at a concentration higher than expected for the general populace.

97.     Plaintiffs and Class Members are at greater risk for conditions proven to be linked to exposure to radioactive and other toxic materials as a result of the conduct of the Defendants complained of herein.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants to conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

99.     Plaintiffs and Class Members require medical monitoring to mitigate the harm caused by the Defendants' actions complained of herein. Testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest stage.

100.     Plaintiffs and Class Members will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to radioactive particles may be identified so that treating professionals may better care for the Class

Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

101.     The harms visited upon Plaintiffs and Class Members are irreparable. Money damages alone will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual Class Member nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

102.     Furthermore, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby important information is shared among the medical community so that new treatments, protocols, intervention and test may be developed.

103.     Plaintiffs, on behalf of all those similarly situated, seek a Court-administered fund replenished from time-to-time by the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the Class, including a court-administered medical monitoring program.

104.     Given the immense wealth of the Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the Defendants.

## COUNT VI
## DECLARATORY JUDGMENT

105.     Plaintiffs re-allege each and every allegation set forth the preceding paragraphs as if fully restated herein.

106.     Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201. The allegations herein present ascertained or ascertainable facts of a present controversy between Plaintiffs, Class

Members and Defendants

107. Plaintiffs, on behalf of those similarly situated, seek declaratory judgment clarifying the rights and obligations of the parties to each other.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

(1) An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Class (or subclasses, as appropriate) and appointing undersigned counsel to represent the Class;

(2) An award of damages for Class Members who incurred any out-of-pocket expenses as a result of Defendants' acts or omissions along with an award of damages to pay for any necessary mitigation or remediation of Class Members' properties;

(3) An award of damages to compensate for loss of use and enjoyment of property, annoyance, nuisance, aggravation, and inconvenience as a result of Defendants' acts or omissions;

(4) An award of punitive damages for all Class Members who were exposed to radioactive materials as a result of Defendants' acts or omissions;

(5) An Order implementing a remediation and cleanup of the Plaintiffs' and Class Members' properties;

(6) An Order implementing a medical surveillance and medical monitoring program;

(7) Prejudgment and post-judgment interest;

(8) An Order establishing such administrative procedures as are reasonable to effectuate the relief granted to Plaintiffs and the Class Members;

(9) Declaratory relief clarifying the rights and obligations of the parties to each other;

(10) An order requiring Defendants to pay for the costs of this proceeding, including

reasonable attorneys' fees and costs, including, but not limited to, costs of class notice and administration; and

      (11)    Such other relief as the Court or Jury may deem appropriate.

 

Respectfully submitted,

LEIST WARNER, LLC


/s/ *Patrick G. Warner*
Patrick G. Warner (0064060)
pwarner@leistwarner.com
Darrin C. Leist (0070533)
dleist@leistwarner.com
LEIST WARNER LLC
513 East Rich Street, Suite 201
Columbus, Ohio 43215
Telephone: (614) 222-1000
Facsimile:  (614) 222-0890
www.leistwarner.com

*Counsel for the Named Plaintiffs and Putative Class Counsel*

## DEMAND FOR TRIAL BY JURY

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this

Complaint that are so triable as a matter of right.

LEIST WARNER, LLC


/s/ *Patrick G. Warner*
Patrick G. Warner (0064060)
pwarner@leistwarner.com
Darrin C. Leist (0070533)
dleist@leistwarner.com
LEIST WARNER LLC
513 East Rich Street, Suite 201
Columbus, Ohio 43215
Telephone: (614) 222-1000
Facsimile:  (614) 222-0890
www.leistwarner.com

*Counsel for the Named Plaintiffs and
Putative Class Counsel*